**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

**CASE NO. 16-20033-CR-LENARD/GOODMAN**

UNITED STATES OF AMERICA

v.

TIMOTHY NATHANIEL BROWN,

     Defendant.

_____/

<u>**REPORT AND RECOMMENDATIONS ON MOTION TO SUPPRESS**</u>

At approximately 11:30 AM, on the morning before Thanksgiving, 2013, two uniformed Miami-Dade Police Officers arrested Defendant Timothy Nathaniel Brown at a large indoor/outdoor shopping mall/flea market for being a felon unlawfully in possession of a gun. The United States did not introduce any evidence of crime statistics for the shopping mall, nor did it introduce any evidence to compare the crime rate there to the rates in other locations. One of the two officers described the shopping mall as a "problem" area and testified that he had responded to the shopping center before for drug cases, robberies and assaults. According to a surveillance video, shoppers were walking in and out of the mall that morning and were also strolling through a concourse area.

Brown's motion to suppress raises the following issue:  Did the officers have a reasonable and articulable suspicion sufficient to justify a *Terry*-type investigatory stop and a brief pat-down for weapons based on (1) an anonymous tip to Crimestoppers -- that a convicted felon was carrying a concealed weapon at a designated spot at the shopping center -- which accurately described Brown's appearance, and (2) an officer's contention (not mentioned in any of the two police reports) that Brown "looked left to right" and appeared nervous when he saw the officers approaching?

United States District Judge Joan A. Lenard referred [ECF No. 30] Brown's motion to suppress physical evidence and statements [ECF No. 24] to the Undersigned for an evidentiary hearing and report and recommendations. The Undersigned held the evidentiary hearing on April 5, 2016. [ECF Nos. 40; 43]. Miami-Dade Police Officer Jose Freire, Miami-Dade Police Officer Kelmi Ramos, Miami-Dade Police Detective (and Alcohol, Tobacco, and Firearms ("ATF") Taskforce member) Jonathan Ruiz, and Federal Public Defender Investigator Bosco Guzman testified. [*Id.*]. At the conclusion of the hearing (and after making certain factual findings from the bench), the Undersigned ordered supplemental briefing. [ECF No. 42].

The parties submitted their supplemental briefing on April 25, 2016. [ECF Nos. 44; 45]. The matter is now ripe for ruling. For the reasons outlined below, the Undersigned **respectfully recommends** that the District Court **grant** Brown's motion and suppress the evidence derived from the illegal pat-down (the firearm), as well as all

2

statements made by Brown from the moment of the pat-down through his official post-*Miranda* statements to detectives while in custody at the police station.

## I.        PROCEDURAL AND FACTUAL BACKGROUND

Brown is charged with possession of a firearm by a convicted felon, in violation of Title 18, United States Code, Sections 922(g)(1) and 924(e). [ECF No. 3]. The charge arises from a search of Brown's person by Miami-Dade Police Officers in response to an anonymous tip to Crimestoppers, during which officers found one Hi-Point Model C9 9mm pistol and eight rounds of 9mm ammunition. At the time of his arrest and hours later while in police custody, Brown made several statements concerning the circumstances under which he received the weapon.  In his suppression motion, Brown seeks (1) to suppress all physical evidence recovered during his arrest and subsequent detainment (the firearm, ammunition and a DNA sample) and (2) to suppress all statements he made upon his arrest and through his later questioning in police custody. [ECF No. 24].

### A.        Facts

The factual basis underlying this Report is based on the testimony of four witnesses -- Officer Freire, Officer Ramos, ATF Taskforce member Ruiz, and Federal Public Defender Investigator Guzman -- and the exhibits introduced by the Government and Brown.

On November 27, 2013, uniformed patrol officers with the Miami-Dade Police Department, Kelmi Ramos and Jose Freire, received a dispatch call that someone had made an anonymous tip to Crimestoppers advising that there was an individual -- described as a one-armed African American male with dreadlocks, wearing red shorts and a white t-shirt -- at the Northside Center Flea Market (the "flea market") who was a felon carrying a firearm in the waistband of his shorts. [ECF No. 43, pp. 69-70].

The tipster did not provide a name of the suspect.

Officers Freire and Ramos responded to the flea market, and after spending several minutes driving around the vicinity, located an individual who matched the description (Brown), approached him, and patted him down for officer safety. In this pat-down, the officers located a firearm in Brown's waistband and detained him.

### 1.    *Testimony of Officer Freire*

As the Undersigned stated at the end of the evidentiary hearing [ECF No. 43] and in the Post-Hearing Administrative Order [ECF No. 42], the Court is not crediting Officer Freire's testimony about some of the important circumstances of Brown's arrest because it is inconsistent with (1) the two reports produced by Officer Freire after the arrest, (2) the video surveillance evidence and (3) Officer Ramos's testimony.

Specifically, Officer Freire testified that he saw Brown standing on an outside sidewalk and that Brown abruptly turned and walked away after Brown looked toward his police car in the parking lot. Officer Freire further testified that he sped up, pulled in

4

front of Brown (on the outside sidewalk), got out of his police car, frisked Brown and found a gun in his waistband. [ECF No. 43, pp. 27-34]. However, this testimony is inconsistent with the video evidence presented, Officer Ramos's testimony, and Officer Freire's own reports of the incident.

Officer Freire's two reports say nothing about Brown being spotted on the outside sidewalk and quickly walking away. In fact, the Complaint/Arrest Affidavit says that Brown was spotted in the *interior* courtyard of the flea market and was searched and arrested there, and the Offense/Incident Report also says Brown was first spotted in the courtyard [Def. Exs. 17; 18, p. 2]. The video surveillance [Def. Exs. 8; 9; 10] confirms this version of events; specifically, the video shows Brown cross the courtyard (approximately 250 feet from the location on the outside sidewalk where Officer Freire claimed to have spotted and detained Brown [ECF No. 43, p. 126]), followed soon thereafter by uniformed Miami-Dade Police Officers, who then detain Brown off-camera and bring him back across the courtyard towards the entrance where Officer Freire claimed to detain Brown.[1]

Officer Freire, a 14-year veteran with the police department, is now **training new recruits,** so his two reports' failure to mention his significant contention that Brown spotted him and began walking quickly away is particularly problematic. Not only did the report not mention this, but it affirmatively stated that Brown was spotted in the

---

[1]    It was the *Defendant* who arranged for the video surveillance evidence collected by the Government to be brought before the Court. [ECF Nos. 32; 36].

interior courtyard, a completely different location. Moreover, Officer Ramos testified that they encountered Brown in the courtyard, so Officer Freire's recollection cannot possibly be correct or reliable.

Thus, because of this glaring inconsistency and the omissions, the Court is not crediting Officer Freire's testimony that he saw Brown turn and quickly walk away; that Officer Freire sped up in his car and stopped Brown in his path; that Officer Freire saw Brown turn around and throw his arm in the air; as well as Officer Freire's testimony about Brown's general demeanor.

The Court *will* credit Officer Freire's testimony that the area of the flea market is a "problem area" that he has responded to many times for crimes such as burglaries, gun cases, altercations, drugs, and occasionally robberies. [ECF No. 43, pp. 14-15]. Additionally, the Court will credit Officer Freire's testimony that he contacted the federal liaison officer once he realized that Brown met certain criteria, as well as the fact that he was the lead officer who handled the reporting and booking of Brown. [*Id.*, at p. 34].

### 2. *Testimony of Officer Ramos*

As previously stated in the Post-Hearing Administrative Order [ECF No. 42], the Court **does** credit (but with one significant caveat) Officer Ramos's testimony about the basic circumstances of the arrest: (1) the arresting officers saw a subject meeting the description provided in the anonymous tip (Brown) in the courtyard of the flea market

(which is consistent with the video evidence); (2) the officers approached Brown to seize him; (3) Brown looked left to right; (4) that Brown had a "surprised," "shocked" and/or "scared" look on his face; and (5) that the officers immediately patted down Brown and found a gun stashed in his waistband.

Specifically, Officer Ramos testified as follows:

On November 27, 2013, he was on uniformed patrol in the vicinity of the flea market. Dispatch reported over the police radio that Crimestoppers received an anonymous tip "advising of a black male with dreads, wearing a white T-shirt, red shorts. He's missing his arm. He has one arm. He's carrying a firearm in his waistband. He is a felon standing in front of the blood bank next to the nail shop." [ECF No. 43, p. 70]. Officer Ramos responded to the flea market, where he spent several minutes circling the shopping center in the parking lot in his patrol car looking for an individual meeting the description. [*Id.*, at pp. 71-72]. In his initial search efforts, Officer Ramos could not find anyone meeting the description. [*Id.*, at p. 72]. Officer Ramos then contacted Crimestoppers for additional information and was advised that the individual was actually inside the flea market. [*Id.*, at p. 72].

At this point, because "you can't go inside the flea market in a vehicle[,]" Officer Ramos exited his vehicle and proceeded on foot with Officer Freire into the shopping center toward the interior outdoor courtyard to locate the individual described in the tip. [*Id.*, at pp. 74-76]. As the two officers entered the shopping center, Officer Ramos

7

saw an individual matching the description from the anonymous tipster. [*Id.*, at p. 76].

He and Officer Freire walked towards the individual who "look[ed] like he was waiting

for somebody or just looking left and right." [*Id.*]. Officer Ramos described this

individual -- later identified as Brown -- as looking "surprised. And then he was

shocked, scared . . . like an oh-shit factor." [*Id.*, at p. 78]. The Officers approached Brown

at this point; Officer Ramos told Brown to keep his hand up and Officer Freire patted

Brown down and advised Officer Ramos that there was a gun in Brown's waistband.

[*Id.*, at p. 76].

The video surveillance of the courtyard area [Def. Ex. 8] confirms Officer

Ramos's account. At approximately 11:30:00, an individual matching the Crimestoppers

tip -- red shorts, white t-shirt -- walks from right to left across the top left corner of the

camera frame. At 11:30:50, two uniformed officers are seen walking right to left across

the camera frame through the central courtyard of the flea market. [Def. Ex. 8]. At

11:32:01, two uniformed officers are seen walking back across the camera frame -- from

left to right -- accompanying an African-American man in red shorts and a white t-shirt.

[Def. Ex. 8].

But the video surveillance neither confirms nor contradicts Ramos's testimony

that Brown looked surprised (because it does not show the actual initial approach and

search). However, neither of the two police reports mentions anything about Brown

looking surprised or looking left and right. Instead, as explained above, the two reports

mention only one factor leading to the officers' search of Brown: the anonymous tip to Crimestoppers.

There was no evidence that Brown tried to flee. There was no evidence that he made any furtive gestures. In addition, there was no testimony that officers spotted a bulge which might indicate the presence of a weapon or a handgun. There was no testimony that Brown tried to hide or drop any evidence. The two officers did not testify that they were in fear when they approached Brown in the courtyard of a large shopping mall. The only testimony about the grounds for the search, other than the anonymous tip, is the contention that Brown looked left to right and appeared surprised.

As soon as Officer Freire told Officer Ramos of the gun, Officer Ramos grabbed Brown's arm, told him to relax and handcuffed him. Additionally, Officer Ramos advised Brown why he had been detained and searched -- that someone had provided a tip that he had a gun on him. [ECF No. 43, p. 82]. Before or after Officer Ramos advised Brown of this, Brown spontaneously stated that someone told him to hold the gun for a second or so, and advised repeatedly that he was set up. [*Id.*, at p. 77]. Brown was then taken to Officer Freire's vehicle, which was used to drive him to the Northside police station. [*Id.*]. As the backup officer, Officer Ramos assisted with the property receipt and then had no further involvement with the matter.

### 3. *Testimony of Jonathan Ruiz*

Detective Jonathan Ruiz of the Miami-Dade Police Department, who is also cross-designated as a task force officer for ATF, testified about his involvement in the questioning of Brown after he was in custody at the Northside police station. [*Id.*, at p. 84]. Detective Ruiz received information from another task force officer on November 27, 2013 that Brown had been detained as a felon in possession of a handgun and was at the Northside police station. [*Id.*, at p. 86]. Detective Ruiz then contacted Officer Freire and informed him that he would be responding to the police station. [*Id.*].

After receiving an in-person synopsis of the arrest from Officer Freire, Detective Ruiz and another Miami-Dade detective met with Brown in a booking room and gathered his personal information from him -- his name, date of birth, address, phone number, education level. [*Id.*, at p. 88]. Detective Ruiz then administered written *Miranda*[2] warnings to Brown before asking him substantive questions concerning the crime; Brown signed the form [Gov. Ex. 5], acknowledged that he understood his rights and agreed to speak to Detective Ruiz and the other detective. [*Id.*, at p. 89].

Detective Ruiz's conversation with Brown was recorded. [Gov. Ex. 6]. In this recorded conversation, Brown described his activities that day, including accompanying his girlfriend to the flea market where she was to get her nails done. [*Id.*]. Brown waited outside and smoked a cigarette after chatting with some individuals

---

[2]    *Miranda v. Arizona*, 384 U.S. 436 (1966).

he knew. [*Id.*]. Brown stated that at some point one of these individuals approached him and handed him a gun to hold. He accepted the gun and put it in the waistband of his shorts. [*Id.*]. After going into a couple of different stores -- still possessing the gun in his waistband -- Brown stated that he met with his girlfriend again, at which point the uniformed officers approached him, grabbed him and frisked him. [*Id.*].

After the recording was complete and while Brown was in custody, Detective Ruiz also obtained consent from Brown to take a DNA sample. [ECF No. 43, p. 110].

Detective Ruiz testified further concerning the Crimestoppers program, explaining that it is a telephone line where anonymous tipsters can call in crimes and, under certain circumstances, receive compensation. [*Id.*, at p. 101-02]. In a case where a felon is reported with a gun, and law enforcement finds and arrests the individual with a handgun, the tipster can earn $1,000. [*Id.*].

At the time of the arrest, in November and early December 2013, Detective Ruiz confirmed that the case was to be prosecuted by state authorities. [*Id.*, at p. 113]. State authorities "no actioned" the case and dropped the charges in state court. Ruiz confirmed that the state charges were dropped but could not also confirm that the state charges were dropped 30 days or so afterwards. [*Id.*, at pp. 113-14]. Nevertheless, the parties (i.e., through their attorneys) appear to concede that the state charges were dropped approximately one month after Brown's local arrest by Miami-Dade Police

Officers. The federal arrest warrant, based on an indictment, was issued on January 19, 2016, more than two years later.

Neither the United States nor the Defendant advised the Court about what, if anything, occurred in the case during the 25-month gap between the dropping of the state charges and the federal indictment (which is based on the same facts -- a felon in possession of a gun). Nevertheless, in an Order [ECF No. 28] granting the United States' motion to amend an order of release entered by another federal magistrate judge, District Judge Lenard noted that "when the Defendant learned of the pending Indictment,  he traveled from Tennessee on his own initiative to surrender to law enforcement officials here in South Florida."

The witnesses did not explain why the police reports did not mention that Brown looked left to right and appeared surprised and the Government did not proffer a reason for the omissions either.

## II.    LEGAL PRINCIPLES AND ANALYSIS

### A.    <u>Whether there was reasonable suspicion under *Terry v. Ohio*[3]</u>

The motion to suppress centers on whether the seizure of Brown was a proper *Terry* stop, such that the two officers had "reasonable suspicion" of "specific and articulable facts" to temporarily detain and search Brown. *See Terry*, 392 U.S. 1.

---

[3]    *Terry v. Ohio*, 392 U.S. 1 (1968).

Under *Terry*, "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon[.]" *Terry*, 392 U.S. at 24. The officer is not required to be "absolutely certain" that the subject is armed, but rather the "issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 27.

Although *Terry* uses a lesser standard than probable cause, the officer must be able to point to "specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrants the intrusion." *Id.* at 22. To determine if a reasonable suspicion existed at the time of a police encounter, courts look to the "totality of the circumstances." *Id.* "[U]nder appropriate circumstances, an anonymous tip can demonstrate 'sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop.'" *Navarette v. California*, 134 S. Ct. 1683, 1688 (2014) (quoting *Alabama v. White*, 496 U.S. 325, 327 (1990)).

The "appropriate circumstances" require that the anonymous tip be suitably corroborated. "Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, . . . an anonymous tip alone seldom demonstrates the informant's basis of knowledge or

veracity." *Florida v. J.L.*, 529 U.S. 266, 270 (2000) (citing *Adams v. Williams*, 407 U.S. 143, 146-47 (1972); *White*, 496 U.S. at 329) (internal quotations omitted).

In *White*, the police received an anonymous tip that a woman was carrying cocaine and that she would leave a certain apartment building at a specified time, get into a car matching a specific description, and drive to a specific location. 496 U.S. 325. The Supreme Court held that the suspicion of the individual in *White* became reasonable after police observation showed that the informant had accurately predicted the subject's movements. *Id.* However, the Supreme Court regards *White* as "borderline" or a "close case;" recognizing that "[k]nowledge about a person's future movements indicates some familiarity with that person's affairs, but having such knowledge does not necessarily imply that the informant knows, in particular, whether that person is carrying hidden contraband." *J.L.*, 529 U.S. at 271.

In *J.L.*, the Supreme Court held that the anonymous tip in question lacked the "moderate indicia of liability present in *White*" because the call included no predictive information about the subject and thus provided the police with no means with which to test the caller's reliability. *Id.* The anonymous tip in *J.L.* merely reported that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." *Id.* at 268. Based upon this tip alone, without the suspect making any "threatening or otherwise unusual movements," the police approached the suspect, told him to raise his hands, frisked him and found a gun. *Id.* The Supreme Court noted that

14

just because the allegation about the weapon turned out to be true *after* the search "does not suggest that the officers, prior to the frisks, had a reasonable basis" to suspect the subject was engaged in unlawful conduct. *Id.* at 271.

The Eleventh Circuit has held that certain behavior by the subject of an anonymous tip upon the appearance of law enforcement may imbue the tip with the requisite indicia of reliability to justify a *Terry* stop under certain circumstances. *See e.g. United States v. Lindsey*, 482 F.3d 1285, 1291 (11th Cir. 2007) (where police (1) had knowledge of three to four African American men who were suspected of a series of bank robberies using large weapons and driving large SUVs, (2) the tip was a report of four African American men loading large weapons into an SUV in the vicinity of one of the previous crime scenes, and (3) upon the arrival of police to the area, the SUV suddenly moved from its parked position, the tip was sufficiently corroborated).[4]

In the Government's briefing [ECF No. 37, p. 8], it points to cases outside the subject of anonymous tips as well, where the Eleventh Circuit acknowledged that

---

[4]     The Government additionally cites to *United States v. Heard*, 367 F.3d 1275, 1280 (11th Cir. 2004), for the principle that a "suspect's adverse reaction to police may independently corroborate information provided by an anonymous informant." However, the Government quotes the Eleventh Circuit out of context. The facts of *Heard* involve a *face-to-face* tip, which the Court notes is "presumed to be inherently more reliable than an anonymous telephone tip because the officers receiving the information have an opportunity to observe the demeanor and perceived credibility of the informant." 367 U.S. at 1279. The quote the Government inserts in its briefing is seemingly *dicta* (citing to no Eleventh Circuit or Supreme Court authority), and part of a longer sentence making a different point altogether in the context of the case, which is that "a compliant reaction does not . . . undermine the tip's reliability." *Id.* at 1280. Accordingly, the Undersigned does not believe *Heard* to be particularly applicable.

presence in a "high crime" area plus evasive behavior may constitute reasonable suspicion. As with the Government's reference to *Heard*, there are some leaps required to link the facts of those cases to the present matter. Specifically, in *United States v. Hunter*, 291 F.3d 1302, 1306-07 (11th Cir. 2002), a *Terry* stop and pat-down was deemed legal where a subject with a notable bulge in his waistband was spotted by police officers walking quickly away from an illegal dice game in an area known for high crime. The "totality of the circumstances" in *Hunter* features multiple additional indicators of suspicion unseen in the present case.

Additionally, in *United States v. Gordon*, 231 F.3d 750, 755-56 (11th Cir. 2000), after a reported robbery involving four men, the subject and three others were spotted by police officers standing ten feet away from a vehicle in a high-crime area occupied primarily by abandoned apartment buildings. Upon seeing officers, the subject's "eyes lit up" and all four men ran quickly to the vehicle and drove off. *Id.* Again, there are several additional layers of suspicious activity present in *Gordon* that do not match the present case. Moreover, the involvement of a "high-crime" area does not quite match the *Gordon* scenario, as the present case involves a crowded shopping center of legitimate businesses in broad daylight, which contrasts sharply with the block of abandoned buildings at nighttime described in *Gordon*.

Nonetheless, "the fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a *Terry* analysis." *Illinois v. Wardlow*, 528 U.S. 119,

124 (2000) (a defendant's evasive and unprovoked flight, along with his presence in a high-crime area, aroused sufficient, reasonable suspicion to lawfully stop an individual and conduct a pat-down).

Additionally, "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Id.* In *United States v. Reed*, 402 F. App'x 413, 415 (11th Cir. 2010), the Eleventh Circuit found reasonable suspicion where the officer encountered the subject "in a known high crime area and initiated a *Terry* stop after witnessing furtive 'fight or flight' eye movement, as well as hand and body movements and positioning that indicated to [the officer] that [the subject] was attempting to conceal or discard something as the officer approached." *See also United States v. Field*, 178 F. App'x 890, 891 (11th Cir. 2006) ("the tip, along with [the subject's] presence at a house known by officers in the area for high drug activity, a short distance from the intersection described by the informant, and [the subject's] evasive behavior in first driving away in an accelerated manner from three marked patrol cars and then later walking away and ignoring [an officer's] attempts to get his attention, are sufficient for a finding of reasonable suspicion].

As described at the evidentiary hearing (and established in the factual findings above), Officers Freire and Ramos faced the following specific circumstances at the flea market on November 27, 2013: (1) An anonymous tipster reported that an individual with dreadlocks and one arm, wearing red shorts and a white t-shirt was located at the

flea market and smoking a cigarette outside of a blood bank near a nail salon [ECF No. 43, p. 7]; (2) the anonymous tip indicated that this subject was a convicted felon [*id.*]; (3) the tip claimed that this individual possessed a firearm in his waistband [*id.*]; (4) the flea market was a "problem area" that police responded to on many occasions for an assortment of crimes, including gun offenses [*id.*, at pp. 14-15]; and (5) when the Officers spotted Brown (who met the description of the tip), he was supposedly looking left and right, and upon seeing the Officers, allegedly expressed an "oh-shit look" of surprise and shock [*id.*, at p. 78]. Notably, Brown did not make any furtive gestures, flee or attempt to evade the Officers (or even to walk away).

These facts do not establish sufficient corroboration of the anonymous tip to justify the Officers' search of Brown.

Before analyzing the relevant factors, I will flag my reluctance to wholeheartedly accept Officer Ramos's testimony about Brown's surprised look when the officers approached. First, this contention, which the Government heavily relies upon, is not in either of the two police reports. Freire has 14 years of experience as a police officer and Ramos has 12 years. They are seasoned veterans and should know the importance of including significant information in police reports. When preparing reports on the search of an individual based on an anonymous tip and other factors, the officers surely and easily could have at least mentioned, even succinctly, the other factors -- i.e., that Brown looked left to right and appeared surprised as officers approached. They didn't

do that, however. That failure is something which I can, and will, factor into the analysis.

The absence of information relied upon by police in the police report "may impact the credibility of the officer's testimony." *United States v. Evans,* 994 F.2d 317, 321-22 (7th Cir. 1993). To be sure, a police report is not intended to be a detail-laden, comprehensive, all-encompassing account of every event involved in an encounter. Instead, it is a summary of the significant events.

Because police searched Brown based on an anonymous tip, the contention that he looked from side to side and appeared surprised when he saw police are not the type of insignificant details which should be omitted from a police report. To the contrary, it would be difficult to imagine a more-relevant factor concerning the suppression motion. Thus, the reports' total omission of these factors is surely "notable" and one which can be factored into the credibility analysis. *See United States v. Dessesaure,* 314 F. Supp. 2d 81, 88, n. 10 (D. Mass. 2004) (granting in part motion to suppress and questioning the reliability of police testimony containing "important details" which were not in the police report created ten months earlier); *United States v. Humphries,* No. 04-CR-535, 2004 WL 2743432 (E.D. Pa. Nov. 29, 2004) (rejecting Government's request to adopt the plain view doctrine after noting that the officer's testimony was 'inconsistent with the police reports filed immediately after the incident"). *Cf. United States v. Curran,* No. 1:13-CR-259, 2014 WL 2042138, at *2, n.5 (M.D. Pa. May 19, 2014) (relying on

officer's version of events in his report, rather than his testimony at a suppression hearing, because "the order of events were certainly more clear in the detective's mind at the time of writing the reports").

Moreover, this search occurred approximately two and a half years before the suppression hearing and the Government has not articulated any theory, let alone evidence, to suggest how or why these officers' recollections of a relatively routine search and arrest are now accurate and complete. Given that the State dropped the charges almost immediately and the United States has not proffered a reason -- such as intervening trial or deposition testimony -- why either officer would have any reason to even think about the arrest at all during the past two and a half years, it is difficult for the Undersigned to fully accept the notion that Officer Ramos's recollection about Brown's head movement and facial expression is completely sound.

Consequently, the Government's factual position about Brown's purported look of surprise is, in my view, problematic. Its reliance on this factor rests on a shaky foundation, given the complete absence of the information in the two police reports, the age of the case, the officers' limited involvement two and a half years ago, and their lack of continued involvement until only recently. Thus, although this analysis *discusses* the surprised look, it does so with a skeptical approach and it does ***not*** *accept as a fact* the surprised look argument.

The Government contends that the tipster's assertion that the subject with the weapon was a felon is indicative of "special familiarity" with the individual. *See J.L.*, 529 U.S. at 271 ("[k]nowledge about a person's future movements indicates some familiarity with that person's affairs"). In *J.L.*, the Supreme Court described the situation in *White* as follows: "Only after police observation showed that the informant had accurately *predicted* the woman's movements . . . did it become reasonable to think the tipster had *inside knowledge* about the suspect and therefore to credit his assertion about the cocaine." *Id.* (citing *White*, 496 U.S. at 332) (emphasis supplied). However, the mere fact that a tipster's assertion is confirmed *after* the search does not imbue the officers with any special knowledge *before* they conduct a search. *See id.* "The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search[,]" *not* by what is confirmed after the fact by the search itself. *Id.*

Any person is capable of observing a stranger on the street and alleging that stranger is a felon; by chance alone, the assertion could turn out to be correct. This obviously does not confirm that this knowledge was actually known beforehand. The tipster did not predict that the suspect would be engaging in any particular **activity** which could be confirmed. Thus, the Undersigned is not convinced that the mere assertion by the tipster that the subject had a felony record is indicative of any special knowledge on behalf of the caller.

Nor am I convinced that the contemporaneous description of the subject being at a certain location, wearing certain clothing and smoking a cigarette is any way corroborative of the assertion that this individual also possessed a handgun. While the Supreme Court in *White* found information that was *predictive* of *future* activity to be a "close call" of sufficient indicia of reliability, 496 U.S. at 329, a mere *contemporaneous* description of an individual's presence at a specific location lacks reliability. Again, as with the supposed "inside knowledge" of the subject's status as a felon, this is an observation that *any* person in the vicinity can make and report anonymously to the authorities (along with information about a crime that may or may not be true) without repercussions. "An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity." *J.L.*, 529 U.S. at 272.

Finally, I do not find Brown's supposed "oh-shit" reaction, combined with his presence at the flea market, to be sufficient indicia of reliability to justify a search. To be sure, a defendant's evasive and unprovoked flight, along with his presence in a high-crime area, may arouse sufficient, reasonable suspicion to lawfully stop an individual and conduct a pat-down. *See Wardlow*, 528 U.S. at 124.

But Brown did not flee. He did not even try to walk away. And I'm not convinced that this large flea market is the same type of high-crime area which is

sometimes sufficient to help generate reasonable suspicion. The location under analysis is a large shopping area. It is not an isolated, abandoned building. Unlike a drug house or a stash house, it is not an inherently dangerous location where innocent persons would not be expected to appear. To the contrary, it is a place of legitimate retail business, with plenty of shoppers and pedestrians on a morning the day before Thanksgiving Day. There may be crime which occurs there, but the Government did nothing to support its contention that it is a "high crime" area, other than having an officer describe it as a "problem" area.

To be sure, "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Id.* Similarly, the Undersigned realizes, of course, that innocent behavior may, based on the totality of the circumstances, provide an experienced officer with the requisite reasonable suspicion to conduct a *Terry* stop. *See, e.g, United States v. Tinoco*, 304 F.3d 1088, 1116 (11th Cir.2002) ("Reasonable suspicion exists, moreover, if the cumulative information of which the detaining officer is aware suggests criminal activity, even if each fact, viewed in isolation, can be given an innocent explanation."); *see generally United States v. Valentine*, 232 F.3d 350, 356 (3d Cir. 2000) ("In many cases the Supreme Court has found reasonable suspicion based on acts capable of innocent explanation."); *United States v. Sokolow*, 490 U.S. 1, 10 (1989) (The Supreme Court has found that "'innocent behavior will frequently provide the basis for a showing of probable cause,' and that '[i]n making a determination of probable cause the relevant

23

inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts.' That principle applies equally well to the reasonable suspicion inquiry.") (quoting *Illinois v. Gates*, 462 U.S. 213, 243–44 n. 13 (1983)).[5]

But the Undersigned is not prepared to accept the Government's interpretation of the facts. Instead, I find Magistrate Judge Edwin Torres's guidance in a similar case to be fitting here: "when the totality of the circumstances encompasses solely an isolated instance of innocent behavior, as is the case here, the relevant calculus fundamentally changes." *Melendez*, 2012 WL 1317192, at *8.

Officer Ramos testified that his reasonable suspicion to stop and frisk Brown was based on (1) the anonymous tip (which the Undersigned found above did not include any inherent indicia of reliability) and (2) the fact that Brown appeared "surprised[,] . . . shocked, scared. Like, oh, shit." [*Id.*, at p. 78]. Beyond that, Officer Ramos did not testify that he perceived an actual threat or that Brown attempted to evade the officers, or was in any way, uncooperative. Brown made no sudden movements. He did not flee. The officers did not observe any bulges in his clothing which might indicate a firearm or contraband.

Rather, Officer Ramos testified that the seizure and frisk of Brown was almost immediate to the Officers' approach of him. Thus, in the totality of these circumstances,

---

[5]     Cases collected and described in *United States v. Melendez*, No. 10–20060–CR, 2012 WL 1317192, *8 (S.D. Fla. Mar. 30, 2012).

Brown's single innocent act (appearing "surprised" at the presence of two uniformed officers approaching him at a public flea market) is "neither ambiguous nor suggestive of criminal activity that would even permit an officer to 'resolve the ambiguity' . . . let alone provide a 'particularized and objective basis' for reasonable suspicion." *Melendez*, 2012 WL 1317192, at *8 (quoting *Wardlow*, 528 U.S. at 125; *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)).[6]

The Undersigned recognizes that *Heard* upheld a search where a tip indicated a subject had a firearm and the officer's approach of the subject produced a "stunned reaction." 367 F.3d 1275. As I noted above, however, the tip in *Heard* was given face-to-face, not anonymously; a face-to-face tip is "presumed to be inherently more reliable than an anonymous telephone tip because the officers receiving the information have an opportunity to observe the demeanor and perceived credibility of the informant." *Id.* at 1279. Thus, *Heard* is not controlling here, where the tip was anonymous and not in any corroborated until *after* the search. Moreover, as explained above, the Government's surprised look theory is not, for several reasons, completely convincing in the first place.

---

[6]     As outlined above, I am discussing the surprised look factor, but there is significant doubt as to whether it should be deemed an actual fact.  There is a strong argument that the Government's justification for the warrantless search of Brown should be evaluated *solely* on the anonymous tip about a nameless suspect visible by anyone at or near the shopping center.

Additionally, in *Wardlow*, the officers were driving the last car of a four-car caravan converging on a Chicago neighborhood known for heavy narcotics trafficking -- deemed a "high crime area" -- in order to investigate drug transactions. As the caravan passed one building, an officer noticed the defendant standing next to a building holding an opaque bag. The defendant looked in the direction of the officers and then **fled** down an alley. The officers eventually cornered the defendant on the street. An officer immediately conducted a protective weapons pat-down, relying on his experience that weapons were often found in the vicinity of narcotics transactions. The officer discovered a firearm. *Wardlow*, 528 U.S. at 121–22.

While the Supreme Court may generally use terms at points in the decision (e.g., "the fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a Terry analysis[,]" and "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion[,]" *id.* at 124), the facts of the case are vastly different from the present circumstances -- where Brown did not act evasively or flee.

Furthermore, as explained above, it is debatable as to whether Officer Freire's description of the flea market as a "problem area" necessarily invokes the same "high-crime area" tag discussed in other cases, considering that the events took place in a shopping center filled with many legitimate businesses during normal business hours in broad daylight. As mentioned above, this is vastly different than other descriptions of "high-crime" locales, which, for instance, may involve ongoing criminal activity in

plain view, *Hunter*, 291 F.3d at 1306-07, or the setting of numerous abandoned buildings under the cover of darkness, *Gordon*, 231 F.3d at 755-56.

Thus, for these reasons, the Undersigned does not find that Officer Ramos's description of Brown's demeanor, in combination with the uncorroborated tip, to suffice as grounds for a *Terry* stop.

In the supplemental briefing, the Government introduces an additional argument, claiming that the Court should take into consideration certain factors related to public safety, specifically that the tip involved a felon with a dangerous weapon in a crowded shopping center "surrounded by innocent bystanders." [ECF No. 45, pp. 4-5]. This description of a crowded shopping center filled with innocent bystanders contrasts with the Government's simultaneous argument of the location being uniquely dangerous and high in crime; it is also at odds with the Supreme Court's holding in *J.L.*, which expressly rejected an argument for a *de facto* firearms exception for public safety. 529 U.S. at 272-74 ("an automatic firearm exception to our established reliability analysis would rove too far. Such an exception would enable any person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by placing an anonymous call falsely reporting the target's unlawful carriage of a gun.").

The Government's argument here -- that the reasonable suspicion standard should be lessened or loosened when a tip concerns a firearm in a public place -- roves

too close to the argument that was rejected in *J.L.*. Accordingly, the Undersigned is not convinced that this newly-raised public safety theory should have any bearing on the present analysis.

Thus, for all of the reasons stated above, I **respectfully recommend** that the District Court **grant** Brown's motion and suppress the firearm as the fruit of an unlawful search.

### B.      Whether the statements and DNA sample should be suppressed

In addition to the physical evidence seized during the unlawful *Terry* stop, Brown moves to also suppress all statements he made to the Officers on scene, as well as to Detective Ruiz once in custody at the police station. Brown also seeks to suppress a DNA sample that the government took from him with his consent when he was in custody.

At the evidentiary hearing, the Government conceded that, "if the stop itself is deemed to be unlawful, it violated *Terry*, then we would concede that the statements made after the unlawful detention and arrest are fruit of the poisonous tree." [ECF No. 43, p. 169]. The Undersigned agrees.

"In order to make effective the fundamental constitutional guarantees of sanctity of the home and inviolability of the person, . . . this Court held nearly half a century ago that evidence seized during an unlawful search could not constitute proof against the victim of the search. . . . The exclusionary prohibition extends as well to the indirect as

the direct products of such invasions." *Wong Sun v. United States*, 371 U.S. 471, 484 (1963) (internal quotations omitted). "[V]erbal evidence which derives so immediately from an . . . unauthorized arrest as the officers' action in the present case is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion." *Id.*

Accordingly, the Undersigned **respectfully recommends** that all verbal and physical evidence obtained by the Government after the unlawful search and arrest of Brown should be **suppressed**, as the Government's counsel conceded at the evidentiary hearing.

Otherwise though (i.e. if the District Court disagrees with my assessment that the search was unlawful), there is no indication that Brown was interrogated without first waiving *Miranda*. Detective Ruiz's testimony clearly establishes that the substantive questioning which elicited Brown's statements about possessing the firearm all occurred *after* he signed the *Miranda* waiver form. [ECF No. 43, p. 88]. While Detective Ruiz admits to asking routine booking questions of Brown before presenting him with the *Miranda* waiver form, there is no evidence on the record that Detective Ruiz elicited (or even tried to elicit) any information related to the felon-in-possession scenario before *Miranda* was administered. Additionally, concerning Brown's statement at the scene to Officer Ramos upon his arrest, the record is clear that this was done **spontaneously,** not in response to any questioning by the Officers. [*Id.*, at p. 77]. Thus,

the absence of *Miranda* warnings would not cause his volunteered statements to be excluded (because there was no interrogation). *Rhode Island v. Innis,* 100 S. Ct. 1682 (1980). *See also Cannady v. Dugger,* 931 F.2d 752, 754 (11th Cir. 1991); *United States v. Espinosa-Orlando,* 704 F.2d 507 (11th Cir. 1983)

Thus, if the District Court disagrees with my conclusion that Brown was unlawfully searched, then his statements and his surrendered DNA sample should not be suppressed because the record indicates the statements were either uttered spontaneously or made after Brown had knowingly consented to waiving his *Miranda* rights, and the DNA sample was given after the signing of a consent form.

But, if the search is found unlawful, then the statements and other physical evidence derived from Brown's time in custody should be suppressed, as the Government conceded.

## III.    CONCLUSION

For the reasons outlined above, I **respectfully recommend** that the District Court **grant** Brown's motion and suppress all physical evidence and statements as products of an unlawful search.

## IV.    OBJECTIONS

Under 28 U.S.C. § 636(b)(1) and Local Magistrate Rule 4(b), the parties have until **May 12, 2016** to serve and file written objections, if any, with the District Court. Each

party may file a response to the other party's objection by **May 19, 2016**.[7] Failure to timely file objections shall bar the parties from a *de novo* determination by the District Court of an issue covered in this Report and Recommendations and bar the parties from attacking on appeal the factual findings contained herein. *LoConte v. Dugger*, 847 F.2d 745, 749-50 (11th Cir. 1988), *cert. denied,* 488 U.S. 958 (1988).

  **RESPECTFULLY RECOMMENDED**, in Chambers, in Miami, Florida, on May 3, 2016.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Honorable Joan A. Lenard
All counsel of record

---

[7] The Undersigned is shortening the objections period because the matters have already been comprehensively briefed and the trial date is approaching.

31